# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

Case No. 17-20038-DDC

LUIS ALBERTO QUINTERO-JIMENEZ (01),
SEAN ALEXANDER TENNISON (14),
EUARDO GARCIA-PATINO (18),

    Defendants.

## MEMORANDUM AND ORDER

This matter came before the court based on defendant Sean Tennison's Motion for Pre-Trial *James* Hearing (Doc. 518). Defendant Eduardo Garcia-Patino joined the request made by that motion (Doc. 528). The court granted both motions on July 25, 2019. Doc. 538. Also, the Trial Management Order required the government to disclose those statements that it plans to offer into evidence under Fed. R. Evid. 801(d)(2)(E). Doc. 539 at 2. The government complied with the deadline, disclosing the information on the due date. *See* Doc. 584. Then, the court conducted a *James* hearing on October 23, 2019. After reviewing the evidence proffered at the hearing, the court, consistent with Fed. R. Evid. 104(a), finds that the government has carried part of its burden under Fed. R. Evid. 801(d)(2)(E). Namely, it has established that a conspiracy existed and that defendants Luis Quintero-Jimenez, Eduardo Garcia-Patino, and Sean Tennison were members of it.

The court is mindful that it must consider and decide whether certain prerequisites exist before allowing a jury to hear out-of-court statements offered under Fed. R. Evid. 801(d)(2)(E). "There must be evidence that there was a conspiracy involving the declarant [of the out-of-court

statements to be offered] and the nonoffering part[ies], and that the statement was made 'during the course of and in furtherance of the conspiracy.'" *Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (quoting Fed. R. Evid. 801(d)(2)(E)). These determinations are preliminary ones and, under Fed. R. Evid. 104(a), responsibility for deciding them rests with the court. The preponderance of the evidence standard applies to these determinations. *See Bourjaily*, 483 U.S. at 176.

Our Circuit has outlined two alternatives a district court may use to resolve these preliminary questions. First, it may conduct a *James* hearing. *See United States v. Gonzalez-Montoya*, 161 F.3d 643, 649 (10th Cir. 1998). In a *James* hearing, the court, outside the jury's presence, hears evidence and decides whether the predicate conspiracy existed. *See, e.g.*, *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995) (discussing *United States v. James*, 590 F.2d 575 (5th Cir.), *cert. denied*, 442 U.S. 917 (1979)). Or, second, and alternatively, the district court may admit the out-of-court statements provisionally, but "'with the caveat that . . . the party offering [it] must prove the existence of the predicate conspiracy through trial testimony or other evidence.'" *Gonzalez-Montoya*, 161 F.3d at 649 (quoting *Owens*, 70 F.3d at 1123 (alternation in original)).

The Circuit has expressed a strong preference for the first approach and so, here, the court required two things of the government. First, it required the government to disclose specific facts its evidence will utilize at trial to prove the existence of a conspiracy. Doc. 539 at 2. The government addressed this requirement with testimony from Drug Enforcement Administration Special Agent Brandon Burkhart and provided the court with various witness proffers, transcripts of recorded telephone calls, and text messages. The court now has heard that testimony and reviewed this evidence. Second, the court required the government to disclose all

2

co-conspirator statements it plans to offer under Fed. R. Evid. 801(d)(2)(E). *Id.* The government also complied with this requirement. Specifically, it filed a Notice of Proposed Conspirator Statements (Doc. 584).

The court now has considered the evidence germane to the first step of this process. That is, the court has heard the agent's summary testimony of the evidence the government will adduce at trial to prove a conspiracy and defendants' participation in it. The court now can rule that the government, consistent with its burden under *Bourjaily* and Rule 104(a), has shown by a preponderance of evidence that a conspiracy existed, and each of the three remaining defendants participated in it. The rest of this Order outlines the basis for the court's conclusions.

**I.      Legal Standard**

The court measures the sufficiency of the government's showings by the well-established definition of an illegal conspiracy:

> To prove a conspiracy, the government must demonstrate:  "(1) that two or more persons agreed to violate the law, (2) that the defendant knew at least the essential objectives of the conspiracy, (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent."

*United States v. Caldwell*, 589 F.3d 1323, 1328 (10th Cir. 2009) (quoting *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007)).  "[A] focal point of the [conspiracy] analysis is whether the alleged coconspirators' conduct exhibited interdependence." *United States v. Edwards*, 69 F.3d 419, 432 (10th Cir. 1995).  Interdependence exists where coconspirators "inten[d] to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged." *United States v. Evans*, 970 F.2d 663, 671 (10th Cir. 1992) (emphasis in original).

For obvious reasons, proving a conspiracy does not require evidence that the participants explicitly agreed to an illegal bargain in a fully integrated, memorialized meeting of the minds. "Circumstantial evidence alone is often sufficient to demonstrate interdependence; indeed, it is

3

often the only evidence available to the government." *Caldwell*, 589 F.3d at 1329 (citing *United States v. Hutchinson*, 573 F.3d 1011, 1035 (10th Cir. 2009)). Nor does this standard require proof of an extensive operating history. "[A] single act can be sufficient to demonstrate interdependence." *Id.* (citing *United States v. Hamilton*, 587 F.3d 1199, 1208–09 (10th Cir. 2009) (determining that a single instance of traveling to collect another drug dealer's debts was sufficient to show defendant became part of a large and wide-reaching conspiracy)).

## II. Summary of the Evidence

At the *James* hearing, the government presented testimony from Special Agent Brandon Burkhart, of the Drug Enforcement Administration ("DEA") the lead case agent in the germane investigation. Special Agent Burkhart's testimony consisted of background information about the scope and mechanics of the investigation into the defendants' activities by the DEA. This investigation began in July 2016 and continued until August 2017. During the investigation, the DEA used confidential informants and undercover officers to complete controlled buys of methamphetamine from various defendants. Eventually, investigators applied for and received Title III wiretaps on eight telephones used by suspected members of the conspiracy.

The investigation revealed an expansive drug trafficking organization ("DTO") operating in the Kansas City metropolitan area. According to the government, the DTO's objective was to sell and distribute high purity methamphetamine for profit. The methamphetamine was supplied by sources in Mexico. Alleged co-conspirators played various roles in the DTO, such as supervisor, dispatcher, translator, transporter, local courier, buyer, and distributor. Transporters retrieved drugs from sources in Mexico and in the United States, transported it across several states to various points in the Midwest, including stash houses in Kansas City, Kansas. DTO members coordinated buys with local distributors. Local couriers transported orders to buyers

after receiving instructions from DTO leaders.  Investigators seized more than 20 kilograms of methamphetamine during the investigation.

Special Agent Burkhart identified three categories of conspirators:  (1) known and indicted conspirators, (2) known and unindicted conspirators, and (3) unknown and unindicted conspirators.  His testimony summarized the involvement of each alleged co-conspirator, the role that person played in the conspiracy, and other pertinent information.  The court summarizes his testimony below, grouping alleged co-conspirators by their role in the DTO.

### A.  Organization Leadership

Defendant Luis Quintero-Jimenez was identified as a leader-organizer of the DTO.  Undercover investigators purchased drugs from him on several occasions.  Mr. Quintero-Jimenez also coordinated buys with the help of defendant Cynthia Rodriguez.

Defendant Juan Quinonez-Leon was identified as the local cell head or overall supervisor.  Mr. Quinonez-Leon was responsible for collecting proceeds derived from drug transactions.  Based on information gathered from co-conspirators, Special Agent Burkhart testified that he believed Mr. Quinonez-Leon had assumed leadership of the DTO after his brother—Javier—had returned to Mexico.  The DTO's finances were under Mr. Quinonez-Leon's control.  He pleaded guilty to aiding and abetting a drug conspiracy the day after the *James* hearing concluded.  Docs. 602 and 603.

### B.  Dispatcher and Translator

Special Agent Burkhart identified defendant Cynthia Rodriguez as the DTO's dispatcher and translator.  Unlike many other conspiracy members, Ms. Rodriguez spoke both English and Spanish.  She took phone calls for the DTO, coordinated orders with supply managers, and instructed couriers to deliver drugs to the DTO's customers.  Ms. Rodriguez pleaded guilty to three counts in the Indictment.  Docs. 358 and 359.  Special Agent Burkhart described Ms.

Rodriguez's anticipated testimony. The government believes Ms. Rodriguez is the wife of co-defendant Luis Quintero-Jimenez.

### C. Transporters

The government identified Mr. Bennie Stone and Mr. Eduardo Garcia-Patino as transporters. Mr. Stone's role in the DTO required him to travel to and from Arizona (and other western locations) and transport drugs back to Kansas City, Kansas. Mr. Stone also made stops in Oklahoma City on his route. Also, in Kansas City, Mr. Stone delivered methamphetamine to several of the DTO's stash houses and directly to couriers at coordinated meetings. The DTO paid Mr. Stone for his services. Mr. Stone pleaded guilty to two counts in the Indictment. Docs. 360 and 361.

Mr. Garcia-Patino transported drugs from a source outside of Kansas to the stash houses in Kansas City, Kansas. Using license plate readers and communications with known DTO couriers, the investigation tracked Mr. Garcia-Patino's vehicle.

### D. Local Couriers

Special Agent Burkhart identified Mr. Benjamin Madrid-Meza, Mr. Michael Brandon Fernandez, and Mr. Ignacio Cruz-Echegeray as local couriers for the DTO. A local courier fills drug orders and transports the orders to the arranged buyer. Couriers also collect payments from drug purchasers.

Mr. Madrid-Meza is related to Mr. Quintero-Jimenez. Mr. Madrid-Meza carried methamphetamine from the DTO's storage locations to various buyers. Special Agent Burkhart testified that surveillance observed Mr. Madrid-Meza delivering methamphetamine to buyers. Also, Mr. Madrid-Meza's communications were intercepted on wiretapped phones. Mr. Madrid-Meza pleaded guilty to three counts in the Indictment. Doc. 590.

Mr. Fernandez was hired by defendant Quinonez-Leon. He worked for the DTO for a short period of time. But, a vehicle registered in his name was used by the DTO. Mr. Fernandez delivered drugs and accepted payment from buyers. Mr. Fernandez pleaded guilty to knowingly and intentionally conspiring with others to distribute and possess more than 50 grams of methamphetamine. Docs. 572 and 573.

Mr. Cruz-Echegeray worked as a local courier. The DTO used his home as a stash house to store the DTO's inventory of methamphetamine and hold proceeds from drug sales. The investigators observed Mr. Cruz-Echegeray's movements through surveillance efforts and confirmed his role though statements from his co-conspirators. Mr. Cruz-Echegeray pleaded guilty to conspiracy to distributing, and possessing with intent to distribute, more than five grams of methamphetamine. Doc. 552.

**E. Buyers and Distributors**

Special Agent Burkhart testified about several people who purchased methamphetamine from the DTO and sold it at retail to users or other distributors. According to his testimony, the buyers, typically, purchased distribution quantities of methamphetamine from the DTO. And, because of the high purity of the methamphetamine, it is likely these buyers resold the drug to other retailers or users after "cutting" it, *i.e.*, diluting it.

Ms. Katrina Job was a buyer/distributor in the Kansas City area. Ms. Job coordinated a large buy with Ms. Rodriguez and met with a local courier to complete the transaction. Ms. Job pleaded guilty to knowingly and intentionally conspiring with others to distribute, and possess with intent to distribute, more than 50 grams of methamphetamine. Doc. 542.

Jalie Brinlee (a/k/a "Kelly" or "Callie") is an unindicted co-conspirator. Her role in the DTO was as a buyer of large drug quantities. Ms. Rodriguez brokered sales to Ms. Brinlee and co-defendant Benjamin Madrid-Meza delivered the drugs.

Special Agent Burkhart characterized defendant Sean Tennison as a buyer and associate of defendant Katrina Job. According to the government, Mr. Tennison asked Ms. Job to broker a large buy—about one kilogram of methamphetamine. But, the DTO lacked the inventory to fill the entire order. Instead, the DTO offered to sell Mr. Tennison a half pound of methamphetamine. Mr. Tennison agreed. Mr. Tennison did not make this purchase directly. Instead, Ms. Job communicated with the DTO on his behalf. The government's evidence reveals only one instance of Mr. Tennison purchasing methamphetamine from the DTO during the period in the Indictment. Law enforcement surveilled the transaction between Ms. Job, Mr. Tennison, and the DTO. At a traffic stop a few minutes later, law enforcement discovered 245 grams of methamphetamine hidden in Mr. Tennison's clothing.

The government identified unindicted co-conspirator Veronica Socoloff as another associate of Ms. Job. The government believes she engaged in drug distribution with Ms. Job.

Christopher Loree was identified as a "high volume" buyer. Mr. Loree's affiliation with the DTO derived from the efforts of his friend, and co-defendant, Thomas Cambiano. Mr. Loree purchased quantities of methamphetamine as large as a kilogram. He brokered those purchases with co-defendant Cynthia Rodriguez. Mr. Loree pleaded guilty to two counts in the Indictment. Doc. 332.

Defendant Thomas Cambiano was associated with Christopher Loree. He introduced Mr. Loree to the organization and, on several occasions, picked up large drug quantities for Mr. Loree. Defendant Cambiano pleaded guilty to conspiracy to distribute, and possess with intent to distribute, more than 50 grams of methamphetamine. Doc. 581.

Jelena Holt was characterized as a buyer. She was introduced to the DTO by now deceased co-conspirator Dillon Reed. Mr. Reed connected Ms. Holt to the DTO while he was

incarcerated, investigators intercepted Mr. Reed's calls.  Ms. Holt then contacted the DTO after Mr. Reed made the introduction.  Thereafter, she purchased methamphetamine from the DTO.  Ms. Holt pleaded guilty knowingly and intentionally possessing methamphetamine with intent to distribute.  Docs. 594 and 595.

The government identified co-defendant Anthony Gomez as a "high volume" buyer.  Mr. Gomez purchased large quantities of methamphetamine (multiple pounds at a time) from the DTO.  Investigators intercepted multiple calls from Mr. Gomez to wiretapped DTO phones.  Investigators also wiretapped Mr. Gomez's phone.  Mr. Gomez pleaded guilty conspiracy to distribute, and possess with intent to distribute, more than 50 grams of methamphetamine.  Docs. 546 and 547.

Defendant Adrian Contreras, the government's evidence contends, is currently living in Mexico.  Mr. Contreras introduced defendant Cambiano to the DTO.  He lived in Kansas City before the investigation began, and his phone was subject to wiretapping.  But, law enforcement never arrested Mr. Contreras.  He remains a federal fugitive.

Alan Barrero, characterized as a customer of the DTO, lived in Lawrence, Kansas.  He traveled to Kansas City to purchase methamphetamine from the DTO.  The purchased drugs were then distributed to other retailers in the area.  Mr. Barrero pleaded guilty to two counts in the Indictment.  Docs. 391 and 392.

Abby Nuzum, Mr. Barrero's girlfriend, accompanied Mr. Barrero on drug transactions, and collected drug money for him.  Ms. Nuzum also distributed some of the methamphetamine on her own.  Ms. Nuzum pleaded guilty to knowingly and intentionally conspiring with others to distribute, and possessing with intent to distribute, more than 50 grams of methamphetamine.  Docs. 410 and 411.

Kasey Kirk, an associate of Mr. Barrero, also purchased methamphetamine from the DTO. He then resold the drugs to other distributors in the area. Mr. Kirk pleaded guilty to two counts in the Indictment. Docs. 355 and 356.

Kyle Tate, a buyer, purchased methamphetamine from the DTO directly. He purchased kilograms and then resold the methamphetamine to other distributors. Mr. Tate pleaded guilty to knowingly and intentionally conspiring with others to distribute, and possessing with intent to distribute, more than 50 grams of methamphetamine. Docs. 402 and 403.

The government also identified co-defendant Heather Burgess as a buyer. Her calls to the DTO were intercepted by wiretaps on other DTO phones. Ms. Burgess purchased drugs on behalf of another person in relatively small amounts. Ms. Burgess pleaded guilty to knowingly and intentionally conspiring with others to distribute, and possessing with intent to distribute, more than 50 grams of methamphetamine. Docs. 483 and 484.

**III.    Analysis**

Based on the testimony of Special Agent Burkhart and the other evidence presented by the government, the court finds that the government has provided the only evidence on the current question, *i.e.*, did a preponderance of the evidence show a conspiracy existed. And, the court finds, the government's evidence show that this conspiracy included defendants Cynthia Rodriguez, Luis Quintero-Jimenez, Bennie Stone, Katrina Job, Jalie Brinlee, Benjamin Madrid-Meza, Eduardo Garcia-Patino, Juan Quinonez-Leon, Michael Fernandez, Sean Tennison, Veronica Socoloff, Christopher Loree, Heather Burgess, Ignacio Cruz-Echegeray, Jelena Holt, Anthony Gomez, Adrian Contreras, Thomas Cambiano, Alan Barrero, Abby Nuzum, Kasey Kirk, and Kyle Tate, as members.

To prove a conspiracy, the government must establish:

> (1) that two or more persons agreed to violate the law, (2) that the defendant knew at least the essential objectives of the conspiracy, (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent.

*Caldwell*, 589 F.3d at 1328. By a preponderance of the evidence, the government has shown that more than 20 individuals took part in an extensive methamphetamine distribution conspiracy in Kansas City. The individuals played various roles, including dispatcher, supervisor, transporter, local courier, and buyer. Wiretapped phone calls reveal an organized operation, frequent communications to coordinate drug supply, sales, and collection of drug proceeds. And, undercover officers completed numerous controlled buys from various members of the DTO.

Based on the government's evidence, and their guilty pleas, the court finds that Cynthia Rodriguez, Bennie Stone, Katrina Job, Jalie Brinlee, Benjamin Madrid-Meza, Michael Fernandez, Veronica Socoloff, Christopher Loree, Heather Burgess, Juan Quinonez-Leon, Ignacio Cruz-Echegeray, Jelena Holt, Anthony Gomez, Adrian Contreras, Thomas Cambiano, Alan Barrero, Abby Nuzum, Kasey Kirk, and Kyle Tate all voluntarily acted together in a conspiracy to traffic and distribute methamphetamine for a profit. But, three defendants remain in this case: Luis Quintero-Jimenez, Eduardo Garcia-Patino, and Sean Tennison. In the following sections, the court considers the government's evidence connecting these defendants to the alleged conspiracy.

**A. Luis Quintero-Jimenez**

The government's evidence identified Mr. Luis Quintero-Jimenez as a leader-organizer of the DTO. Undercover investigators purchased methamphetamine from him on several occasions. Evidence from the wiretap on Ms. Rodriguez's phones revealed that Mr. Quintero-Jimenez also coordinated buys with Ms. Rodriguez's help. The court finds that this evidence supports a finding that Mr. Quintero-Jimenez worked with co-conspirator Ms. Rodriguez to

facilitate drug sales in the Kansas City area. Further, the evidence shows, Mr. Quintero-Jimenez sold methamphetamine to undercover officers. The court thus finds that a preponderance of the evidence showed that Mr. Quintero-Jimenez was a member of the conspiracy.

### B. Eduardo Garcia-Patino

The court concludes that the government has connected Mr. Garcia-Patino to the conspiracy by a preponderance of the evidence. The evidence shows that Mr. Garcia-Patino worked as a transporter for the DTO. At the hearing, and in their brief, the government offered evidence that Mr. Garcia-Patino was stopped by Kansas law enforcement with 20 packages of methamphetamine in his car. Further, Mr. Garcia-Patino received messages from defendant Madrid-Meza with addresses of known stash houses in the Kansas City area. The government's evidence supports the inference that Mr. Garcia-Patino acted on instructions from others leading the DTO and delivered methamphetamine to its stash houses. The court finds that a preponderance of the evidence supports a finding that Mr. Garcia-Patino joined the conspiracy.

### C. Sean Tennison

Mr. Tennison contends that the evidence will not support a finding that he was a member of the alleged conspiracy because the evidence cannot show that he knew about the conspiracy or intended to join it. The government's evidence connecting Mr. Tennison to the alleged conspiracy consists of a phone call to Ms. Rodriguez by Ms. Job asking to purchase $11,000 of methamphetamine for a friend—Mr. Tennison. Ms. Rodriguez responded that the DTO's supply would not permit it to fill that order, but that it could sell him half of a pound. Ms. Job agreed and set up a meeting to facilitate that sale. Law enforcement surveillance observed the drug buy in a Kansas City, Kansas parking lot and initiated a traffic stop on Ms. Job's vehicle after she departed the scene of the buy. Mr. Tennison was inside the vehicle and police located about a half-pound (245 grams) of methamphetamine hidden in his clothing. The government contends

12

that Mr. Tennison joined the conspiracy because, the evidence shows, he sought to purchase a kilogram quantity of methamphetamine. Special Agent Burkhart testified that a typical methamphetamine user would consume one or two grams per day, depending upon the user's tolerance. In his professional experience, when a person purchases more than 200 grams of methamphetamine, it is more likely than not that the individual intends to resell the meth.

"[P]roof of the existence of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy. . . ." *United States v. Watson*, 594 F.2d 1330, 1337 (10th Cir. 1979). And, while a single act can tie an individual to a larger conspiracy, "the single act must be one from which [knowledge of the broader conspiracy] may be inferred." *Id.* To infer intent from just one act, "it must be such as to show the actor's knowledge of the existence and scope of the conspiracy, and his belief that the benefit to be derived from his actions depends on the success of the acts of others." *Id.* (citing *United States v. Perry*, 550 F.2d 524, 529 (9th Cir. 1977)). While purchasing a limited quantity of drugs may not establish membership in a conspiracy, one can infer that a "major buyer" of a controlled substance understands that his purchase results from the interdependent work of a larger operation. *See Evans*, 970 F.2d at 673 (citing *Watson*, 594 F.2d at 1340).

The question whether Mr. Tennison engaged in just one act is somewhat nuanced. But, the court concludes, Mr. Tennison engaged in multiple acts. Specifically, the evidence supports the inference that he initiated communications with one of the DTO's Members—Ms. Job—and then operated with her to negotiate a smaller purchase quantity. Then, he travelled with Ms. Job to complete the sale that she had negotiated with other members of the DTO on his behalf. But the evidence about the outcome of these coordinated efforts is not nuanced. The government's evidence unequivocally shows that Mr. Tennison purchased a "distribution quantit[y]" of

methamphetamine from the DTO.  That is, he purchased a quantity of methamphetamine large enough to create the presumption of intent to distribute.  *See United States v. Waterbury*, 206 F. App'x 805, 810–11 (10th Cir. 2006) (finding that 37.27 grams of methamphetamine was "consistent with distribution quantities").  Here, Mr. Tennison purchased 245 grams of methamphetamine from the DTO.  And, a large purchase of drugs allows for the inference that the buyer is aware of the larger organization responsible for the purchase.  *See Evans*, 970 F.2d at 673.

Though the question is closer for Mr. Tennison than it is for the other two remaining defendants, the court concludes that the government has met its burden to show by a preponderance of the evidence that Mr. Tennison joined the conspiracy.

**IV.    Conclusion**

The government has demonstrated that a conspiracy existed by a preponderance of the evidence.  The court also finds under Fed. R. Evid. 104 that a preponderance of the evidence establishes that  (a) Luis Quintero-Jimenez, Eduardo Garcia-Patino, and Sean Tennison were members of that conspiracy; and (b) Cynthia Rodriguez, Bennie Stone, Katrina Job, Jalie Brinlee, Benjamin Madrid-Meza, Michael Fernandez, Veronica Socoloff, Christopher Loree, Heather Burgess, Juan Quinonez-Leon, Ignacio Cruz-Echegeray, Jelena Holt, Anthony Gomez, Adrian Contreras, Thomas Cambiano, Alan Barrero, Abby Nuzum, Kasey Kirk, and Kyle Tate were members of the conspiracy.  The admissibility (or lack of it) of specific statements by these conspirators depends on showings that the court can't currently evaluate.  The court thus defers for trial the decision whether specific putative co-conspirator statements qualify for admission under Fed. R. Evid. 801(d)(2)(E).  Those decisions must wait until the court can access those statements in the fuller and richer context of evidence adduced at trial.

14

**IT IS SO ORDERED.**

**Dated this 29th day of October 2019, at Kansas City, Kansas.**

                                               **s/ Daniel D. Crabtree**
                                               **Daniel D. Crabtree**
                                               **United States District Judge**